Good morning. We'll hear from counsel in West Penn Allegheny, Ms. Mather. Thank you, Your Honor. I'm Barbara Mather, and I represent West Penn Allegheny in this matter. There you are, the plaintiff below. I'd like to reserve two minutes for your comment. That's granted, and we realize you must have a cold. I do. Or something. Yes. So just speak up so we can understand you. I will try, and if you can't, please let me know. We will. Thank you. Somehow I knew. This case, as the court knows, was dismissed below on a motion to dismiss, and it is unique among Twombly cases. That was the basis of dismissal. Most Twombly cases are based upon evidence of parallel conduct or circumstantial evidence. This is not such a case. This is a case where there is ample direct evidence of conspiracy. What you mean is that you pled, because we don't know what there is. That is correct. There are ample allegations of direct evidence. Allegations of fact. Yes. What do you make, what should we make, of the district court's invocation of its role as gatekeeper? This is a role and a term that we're all well familiar with in the Daubert context before. I think, Your Honor, it... Have I missed something in trying to determine its provenance? I don't think so, Your Honor. I believe that it arises from a fundamental misunderstanding of the Twombly function that the courts have. Twombly didn't use the term. No, Twombly did not use the term gatekeeper, and I don't believe that the insurance brokerage case, which just came down recently from this court, does either. I canceled my last weekend plans and read the insurance brokerage opinion. Me too. Canceled my last week's plans. Judge Schwab took that role very seriously. I believe he did, and I believe it's the wrong role, and that he misapprehends the fundamental function of Twombly, which is laid out, if at great length, in the insurance brokerage case. The fundamental function is to see, is there a minimum of fact pleading, which gives rise to the inference that there will be evidence if discovery goes forward. Well, plausibly, yes, but that is one of the critical functions that go between direct evidence and circumstantial evidence. Well, Justice Souter made it clear. You're voting evidence, in terms of... Direct, pleading of direct evidence, pleading of direct evidence as opposed to circumstantial. Justice Souter made it clear in his dissent thereafter when he said, and he wrote Twombly. Right. When he said, really, Twombly is to get out the strange people who say they're coming from aliens. Right. That sort of people. Well, I'm not sure that the Supreme Court in its subsequent decisions would necessarily go all the way there with Justice Souter, but I do believe that what they are primarily trying to eliminate are cases where you get a pleading that says, they all did the same thing and it must be a conspiracy. That's, more pleading than that is probably required. But in this case, they have been pled. There has been ample pleading of direct evidence. And one of the disturbing things below was not only that the judge decided that he was gatekeeper, by which I think he meant, is this an appropriate case to go forward? Do I think, in the end, it's going to be a good claim? That is not the decision the district judges are, are being asked to make or should be asked to make. But also that he ignored most of the instances of direct evidence. For example. With respect to the conspiracy element? Yes. Specifically with respect to the conspiracy. And if I can give you a couple of examples, I'd like to do that. Paragraph 66. One of the claims of the conspiracy was that there was a conspiracy or an agreement to close Community Blue. The judge below says there's no evidence of agreement. Paragraph 66 says that the UPMC CEO Romoff told his own employees at the health plan that as part of its deal with Highmark, Highmark had agreed to close Community Blue. That evidence was ignored below. Paragraph 101. Highmark rejected repeated proposals for refinancing the West Penn debt. And it said it did so because of threats from UPMC. Ms. Mather, I'm sure if my colleagues have questions about whether there's sufficient allegations with respect to the conspiracy, they'll ask it. I'm not going to frankly inquire in that area at all, but I'm curious about your allegation late in the complaint. And this is a, this is not a notice pleading, this is a 258 count complaint. Paragraph. Yes. And in the latter part of the complaint, you aver that this is a horizontal conspiracy. Are you serious about it? Yes. In what market is it a horizontal conspiracy? It's a horizontal conspiracy, I suppose, in two markets. It is a horizontal conspiracy among the primary predominant insurer in the Pittsburgh market for health care and the primary hospital. So by definition, how can it be? We're talking about the primary insurer and the primary hospital. Isn't that a vertical? Well, in part, it may be two crossing vertical conspiracies and a horizontal conspiracy, but let me come back to the horizontal conspiracy as well. It is a horizontal conspiracy on the insurance market. UPMC has an insurance subsidiary. It agreed not to sell it to United. It agreed not to contract with United. So in that sense, it's direct. From the nature of your allegations, you're not really even arguing that the insurance component of UPMC is competing with, with Highmark. Well, well, I think we are, Your Honor, that part of the agreement with UPMC and Highmark was that Highmark would close Community Blue. UPMC would not expand its insurance subsidiary, nor would it sell it to anybody else. Am I misreading your position that, that, all right, you, you've indicated, you, you continue to argue this is a horizontal conspiracy, but haven't you taken an even-if position? I have. Yes, Your Honor. And with respect, and I'm, I'm not going to, while we believe that the insurance market is a critical piece of that conspiracy, Your Honor, it is not the piece that injures us. The piece that injures us is the quid pro quo. We'll protect you in the insurance market. You will see that West Penn does not grow or indeed declines. I read your brief to say that the relevant market may be high-end medical services. Yes. There are two relevant markets, Your Honor, insurance and high-end medical services. Yes. And how do you allege that they are close to a, close to a monopoly in, for Section 2? UPMC? UPMC is said to have 55 percent of that market. Is that, does any case say 55 percent? I think we have alleged attempt to monopolize, Your Honor. They are and have grown since then, although we don't have current figures, because a number of the entities that were independent have in fact either gone out of business or been merged into UPMC. But there are only two players in this market and in the tertiary and quaternary care. And if West Penn is driven out of business or unable to continue in business and able to compete effectively, unable to invest, then UPMC will become the monopolist in the market. And we believe there is a dangerous probability of that and we have pledged it. You don't think the existence of community hospitals, I know some of which you allege were siphoned off by the agreement in oncology? In cancer care centers, yes, yes ma'am. But they don't have any possibility? They don't provide what are called tertiary or quaternary services. What are they? Neurosurgery, complex heart surgery, severe trauma. I'm sure I'm leaving some out, but it is the most complex care area. And those are all services that typically the community hospital would might handle the intake on a patient, but they would then refer them and indeed they are an important referral source to the tertiary or quaternary care. And at this point there are only two of those and UPMC is the dominant one obviously. Getting back to some of those specific allegations, there's a matter of the district court and this court may consider, may we not, allegations that inherently suggest that a particular action is alleged would be against the interest of the person or entity taking them? Yes, that would be considered a normal plus factor as the court referred to it. You have alleged the loan that Highmark gave West Penn for I think 125 million dollars in 2000, which is prior to the alleged pre-insurance conspiracy. That is correct. Two years later I think the conspiracy is alleged to have come about, destroying West Penn would impair the ability of West Penn to repay that loan. It could potentially, yes. The Highmark had written off the loan. It makes no economic sense, but your honor, this is not a case, you said you didn't want to discuss conspiracy and I'm with you, but this is not a case where we have to guess at why they did that. Highmark could have made that decision itself and then we would be having this discussion about whether it's against interest or not, but they didn't. They made it because they were told to make it by UPMC. The loan figures very much though in the allegata and your allegations with respect to the refusal of Highmark to refinance the loan later on, which you consider to be in furtherance of the conspiracy. Correct. But I mean there are a lot of people out there who were willing to do that, right? And they did get. And they did ultimately get refinance. I mean in 2007 West Penn obtained financing from another source, didn't they? That is correct, your honor, but in this case there was an existing loan which gave Highmark certain rights which we have pled, required their permission for the refinancing alternatives. Highmark repeatedly told West Penn, we think this is basically a good idea, but we can't do it because UPMC has told us that we can't do it. They would allow in other insurers. I think there's one, one person said that once. Is it, do you allege repeatedly? Yes. We allege, first of all I believe the source on that is, I know you allege somebody said it. Yes, I think it's the CEO of UPMC who we allege said it. But in addition to that, at one point during the renegotiation, paragraph 103, the Highmark CEO, Dr. Malani, tells West Penn that UPMC has given him a list of ways that West Penn may ask Highmark for help. UPMC has told him that he is not permitted, Highmark cannot help, or they will go ahead and strike a deal with United. And again, this paragraph is unmentioned in the opinion. There are numerous situations where that is referred to. We're going to give you another five. Yeah, I'd like to ask about the area you've pleaded concerning Community Blue. You've referred to in your allegations to the shutting down of Community Blue, but West Penn isn't a competitor or a consumer in the insurance market. How do you have antitrust standing with respect to that claim and to those? West Penn was the preferred provider under Community Blue. It was a low-cost plan offered at a lower price for insurance to the community. It's the Community Blue subscribers that were directly affected. Well, if you're a competitor in the market and you are cut off from a channel of access to the market, which is this low-cost insurance plan, then I believe under LePage's, under Dentsupply, under the analysis, although obviously it's not a private case in Microsoft, that is an injury to competition, and it is an injury to the entity that is cut off. It was a plan in which there were 200 subscribers. West Penn provided a large part of the services, and once it was cut off, West Penn lost that volume and that access to market. I don't really understand how this works. What kind of arrangement in the business world is made between a hospital and an insurer? Well, there are a number of them, Your Honor. Does a hospital have to approve in advance? If I have Blue Cross insurance, for example, does a hospital have to approve that with Blue Cross before, if I go into the hospital, before they take that card? We could probably spend three days on this, but let me try it on a very simple level if I can. The Blue, insurers can negotiate with individual hospitals, individual contracts, at different rates. We agree. And if they do it unilaterally, they can do it. This, we believe, is not unilateral. We believe it's pursuant to a conspiracy. But the purpose of that negotiation sometimes is for the insurance company to get a low rate from a hospital or group of hospitals and then to steer patients to those hospitals, or perhaps in the plan to restrict patients to those hospitals so that they can lower costs. It is that that they were doing with Community Blue, and it is that that they gave up in their agreement with UPMC when they agreed to put UPMC on every plan. The patient doesn't see. If I go to the hospital and it's a West Penn or UPMC hospital, it may cost 50 percent more at UPMC, but it's all the same to me. It's my insurance rate. I'll ask one more question, then I'll shut up. But you, again, make much in the allegations of the reimbursement rates, right, which you just discussed. And if I understand correctly, temporarily the reimbursement rates for West Penn were set prior to the conspiracy, but really the gravamen of your allegation is that they would have been raised right subsequently. Yes. Assuming that to be correct, how did Highmark's refusal to raise the reimbursement rates of West Penn harm competition? It harmed competition because if you starve a competitor of resources in order to expand, to grow, to effectively compete, then competition has been harmed and that competitor has been harmed. I always thought so, but then there's all this stuff that comes out of the Supreme Court that says, all these cases come out of the Supreme Court, that say the antitrust laws of the Sherman Act is not designed to save a competitor, it's competition. Now, your answer was that a competitor would be harmed. How is competition? Well, I thought my answer was that competition would be harmed, but let me try again. I don't understand. When the last competitor standing is the one who is being driven out of business or deprived of resources, then competition is being harmed. Has the Supreme Court ever said that? No, but this court did in Densupply, and in fact, in the Densupply case, they quote Hovenkamp, which is the leading treatise in the area, which says, consumer injury results when the dominant firm delays or retards growth of a smaller rival. That's what's happening here. Okay, now I have my, maybe my last question. We know that one of the things that concerns the Supreme Court in antitrust cases because they were talking about antitrust cases primarily, right, is that the tremendous amount of discovery and cost to the client and to the system by large-scale discovery that often follows these complaints that have inadequate plausibility. What do you think, if we said you can take discovery but it should be limited, what would you discover? What are your plans or your hopes that, what kind of discovery do you need? Because obviously it's all been stopped by the grant of the motion to dismiss. That's correct. This is not a case, Your Honor, where there is some small issue that is separating the parties. The statements about the conspiracy reflect a broad agreement between Highmark and UPMC. One would need the documents and the communications between UPMC. One would need something that conspicuously isn't in this problem. And one would need to have some discovery of the individuals who have testified that these statements were made because they're critical to the proof of the conspiracy. That's pretty limited as I look at antitrust discovery. That's just a comment, that's not a question. Well, it seems to me I've been unusually quiet thus far. Yes, I noticed. Thank you, Justice. We are friends. That's even without the benefit of discovery or much discovery. The district court found justifiable business reasons for everything that was done or not done and found much or many of your allegations inconsistent. And I say that based on, not on the meticulous questioning of my colleagues, but based on just a broad view of this case. And I wonder if that is consistent with the district court's obligation on a motion to dismiss. No. That was a baseball season. I thought I'd thrown one. That was, I appreciated that, Your Honor, but give me one more sentence to explain why I think that. Those things, there's never been a case where there were not alternate explanations. Those things are called a defense. And when there is a defense, there is a triable issue of fact. And it can go to the fact finder, and you end up with some kind of a verdict. But you cannot, on a motion to dismiss, engage in a few select disclosure of documents and ask the court to believe your version if you're the defendant. That is not what Twombly permits. That is, I believe, what happened here. Do we have to, in reviewing this case and in deciding this case, go through the, is there an overview bottom line it would be appropriate for us to give here, or must we review it with the meticulous care with which you've been questioned here today? I think that if you look at the insurance brokerage case and what it says about direct evidence and what the pleading of direct evidence has been here, I think you can say simply the wrong standard has been applied. Based on the direct evidence allegations and not even get into the parallel. Yes, that's what I would do, Your Honor. Thank you very much. Thank you. Mr. Jacobson. May it please the Court. Jonathan Jacobson for UPMC. Mr. Booker, representing Highmark, intends to focus on the antitrust injury and limitations issues. I'd like to focus on a, what is a question of law for the court, not a matter of weighing evidence and justifications, but a question of law for the court. And that is, what is an unreasonable restraint of trade? That is a legal question, not a, and one that can be resolved at Rule 12 stage. And what is exclusionary conduct under Section 2? Also a question of law that can be evaluated at the Rule 12 stage. And Your Honor, Rule 12, Twombly may not use the word gatekeeper, but it's impossible to read that case without understanding that it departs from what I grew up with, Conley v. Gibson. It departs from the old... Wait a minute. Let's just... Conley v. Gibson was a prisoner case, a pro se prisoner. And Conley v. Gibson for many years has always been the standard. But when you go right back to Conley and Gibson, very different considerations. And finally, Conley v. Gibson was laid to rest. That's right, Your Honor. And laid to rest further in the Iqbal decision. And what the Supreme Court is telling us in these cases, particularly in antitrust cases, is discovery is extensive, discovery is expensive, and that we need to take a close look and make sure that the pleading is sufficient, legally sufficient, before we allow all that money to go out the door. But we all know that discovery can be narrowly tailored also. Not in this case, Judge Smith. Well, respond to Ms. Mather's statement of what she needs to discover. And state why that would be as expansive as discovery in cases that you've been involved in and that we've seen. She gave us a limited amount of discovery that would be, would seem to me, pretty limited. Unless one side or the other puts five lawyers on a deposition. Your Honor, I can assure you that we're not going to do that. But I can also assure you that Ms. Mather has to prove the relevant market. She has to prove market power. She hasn't had a chance to prove anything. I understand. But the discovery on what the relevant market is, the discovery on whether there is market power. Well, she says the relevant market is, on one hand, I mean, this is limited. This isn't Philadelphia, by the way. This is Pittsburgh. Yes. It's a smaller market. She says it's high-end, fancy surgery, you know, fancy. And why is it not all hospital care? This is a typical battleground in hospital cases, Your Honor. Why is it not a good- Because hopefully a district court will be limiting in what it permits for discovery. You'll come in and you'll say this is unnecessary or you'll tell the magistrate judge. And the magistrate judge will consider it and will limit it. I mean, that's what happens in the real world. Your Honor, what happens in the real world is- I've been in the real world. I know you have with Harold Cohen. And I was with Gordon Spivak when I started out practicing law. And I'm very familiar with the process, Your Honor. And I can assure you that in this case, the expenditure of time, money, and resources is inevitably considerable with one person attending each deposition. And I think Judge- Tell us about the law issue that you say- Okay. So I'd like to start first with the Community Blue allegations. And I'm going to forget for the moment the statute of limitations issue associated with that. I'm going to forget for the moment whether there is sufficient pleading of any evidence of conspiracy on Community Blue. Paragraph 66 doesn't do it. Paragraph 66 is simply a prediction from the CEO of UPMC that Community Blue would be closed. It's not a statement that there was an agreement to that effect. But let's assume there was. Let's assume that there is sufficient non-conclusory pleading of an agreement. Closing Community Blue, an agreement to close Community Blue, is not an exclusive dealing arrangement. It does not foreclose West Penn in any way. West Penn is still included in all of the insurance plans that Highmark is offering. The only effect of closing Community Blue is to ensure that UPMC is also included in all of the insurance plans that Highmark is offering. So that patients who are covered by Highmark Insurance have the opportunity to use the hospital of their choice with still full insurance coverage. Did Community Blue charge, well, is there an allegation or do you allege, Community Blue was a lower cost, I guess, premium? I mean, where would the cost be? It would be in the premiums to be paid, right? Absolutely. And I was going to get to that, Your Honor. And that's really the core. If there's anything here, that's the core of it. But is there any allegation in this complaint that there was any agreement between UPMC and Highmark on what Highmark would charge on any of its plans? The answer is no. But if you knock out the low, if you have evidence to knock out the lower cost premium provider, then isn't that inevitably going to affect the cost of insurance? I mean, it permits the other insurers to charge more because there's no, I mean, in essence, that's what competition is supposed to be. Your Honor, a couple things. Let me talk about the other insurance providers. But for Highmark, it has no effect on Highmark's prices at all. It can now charge higher prices. Or lower. Or lower. That's the point, Your Honor. But that's what we have to get in discovery, to see what the rates were. We don't know. I mean, I looked. I was interested in the question that Judge Smith asked. And I looked and looked and I couldn't see anything in the tremendous amount of stuff that's before us that tells what the rates were. Why don't we need discovery to get that? We don't, Your Honor, because what is not in the complaint is any allegation that there was any restriction on the rates that Highmark could charge on any of its plans. Yeah, but the market imposes a restriction. In other words, if you have a, I would think theoretically, because we're talking theory, if the market has a lower cost provider in the market, that necessarily is a restriction on what the remaining insurers can charge. Isn't that? I never took business classes. That's true, but it's a principle that has no application in this case, Judge Slover. Because there's no restriction on what Highmark could charge. And quite the contrary, the allegations in the complaint, if accepted as true, that West Penn's rates were being suppressed indicate that Highmark's costs were lower as a result and that Highmark could continue to charge lower premiums. There's absolutely no suggestion in the complaint that there was any prevention of any other insurers, such as United or Aetna, from having an exclusive arrangement with West Penn that would offer a low cost plan that featured West Penn much in the same way the community blue does. Now, it's not in the complaint, but I can assure you that's actually the case in the real world. But I understand the allegations of the complaint to allege that UPMC, which was the largest of the hospitals, agreed not to accept, who's the big one, United and other insurance companies. Why doesn't that affect the, I mean, and that's the so-called, I guess it's a horizontal, partly horizontal, vertical. So this goes to why West Penn has absolutely no standing to assert that kind of allegation. And the reason, the allegation is that UPMC refused not to contract at all with United and the other insurers, but refused to contract on reasonable terms, whatever that means. And what is missing from the complaint, because it's an allegation that could never be advanced, is that there was anything preventing West Penn from reaching an agreement with any of these insurers on this same sort of low cost plan that would feature West Penn to the exclusion of UPMC, just as the complaint alleges community blue did. So I understand your Honor's point, but it's simply not one that is asserted or reasonably inferable from the allegations in this complaint. All right. Your Honor, on one other point, and my time I see is about to expire. Now we gave her the extra five minutes. You certainly get it. Okay. I guess as you or Highmark's lawyer, we'll give it to you because you represent UPMC. Well, you can arm wrestle over it. So, Your Honor, I'll take a couple of extra minutes and I'll try to leave some for Mr. Booker. I do want to talk about, first of all, just briefly, the price discrimination claim, you know, fails under Judge Breyer's decision in the Monaghan's case. It fails under the Supreme Court's decision in the Link Line case. There's no allegation of conspiracy on price discrimination. There's no, there's an allegation, but it's purely conclusory and insufficient under ICBAO. The only, there's no allegation that we even knew what rates that West Penn was being, was charging to Highmark. And moreover, Your Honor, the record is clear and the judge properly took judicial notice of the fact that West Penn got repeated increases from Highmark while UPMC's rates were frozen for seven years. So not, not. Deal with the fact that the increases could have been a lot higher or the suggestion. That's absolutely right, Judge Barry. That is, that is, that is the allegation. We completely accept that as true. That's simply not an antitrust claim. All right. Link Line makes clear that a price discrimination, there it's the most severe form because the supplier there, the phone companies, are charging a rate internally to themselves that allows them to undercut even the wholesale price being sold to the plaintiff in the case. That's the most severe form of price discrimination. The Supreme Court says that does not state a claim under the Sherman Act. So there's really, there's nothing there. I do want to talk briefly about the Section 2 allegations concerning the community hospital joint ventures. And what is totally missing from this complaint, remember the relevant market here is acute care or tertiary and quaternary care. There is no allegation in the complaint that the joint ventures with these community hospitals had any kind of significance in that market. The foreclosure that is required under Densply, that is required under LePage's, that is required under Microsoft, is clear. It needs to be substantial. And there's no allegation of substantiality here. There's one, there's one case that's not set in our briefs that I'd like to mention to your honor quickly and then I'll get down. It's called CDC against IDEX. It's a Second Circuit decision from Judge Jacobs, 1999. Did you send us a 28-J on that? Your Honor, it's a 1999 decision. Is it in your brief? It is not in our brief. Okay, then you better give us the site. Tell us why it's relevant. It is, Your Honor, I thought about it while we were up here. I believe it's 199 F3rd. I cannot give you the page number off the top of my head, but it's a 1999, Judge Jacobs. You can write us a letter. Thank you, Your Honor. The holding of the, that's a case where there was exclusive dealing arrangements with over 85 percent of the distributors who did, were not actually the customer base. They provided qualified leads, much like the community hospitals here. And the Supreme, the Second Circuit said that that's insufficient and granted summary judgment for the defense. Your Honor, you've been very generous with your time. Well, that's all right. What about the Palmyra Park Hospital case? I'm sorry? What about the Palmyra Park Hospital case? Your Honor, I'm not sure I understand the reference. Well, West Penn sent us a 28-J letter. Oh, the 11th Circuit decision. Yeah, that's the name of it. Yes, Your Honor, my apologies. Unlike you, I didn't just say it's a case from this court. Your Honor, we sent a responsive letter under Rule 28-J. Yeah, well, tell us, tell us why that isn't relevant. Your Honor, I don't have the case at the top of my tongue, but I believe our response in the, in our 28-J letter addresses the issues counsel raised. Thank you. Thank you very much. May it please the Court, I'm Daniel Booker, and I'm counsel for Highmark, Inc. I should tell you that Booker is on our mind all the time. Yes, of course. No relative. You don't do criminal work most of the time, I think. I, I am familiar with the case, and as, as Your Honor may know, and I hope you won't charge this to my time, but in Pittsburgh, there are two great criminal families, the Cabbage Stalks and the Bookers. He's from Pennsylvania. He's from western Pennsylvania. My client. Mr. Booker and I know each other well, and I can assure you he's not defending the case that you are familiar with. But my client is the customer from whom West Penn wants to get higher prices through this litigation, and with respect, Your Honor, the, a plaintiff who comes to an antitrust court and asks for relief and has, who grounds damages on higher prices that they want to justice suitors, little green men, in his, in his dissent. And that is the foundation of the case. And I want to focus on the antitrust injury requirement, which I feel badly for the poor requirement. It's equally as important in antitrust cases at the pleading stage as conspiracy claims, and it was the lead ground on which Judge Schwab dismissed the complaint here. And the nature of the injury alleged in the complaint is clear on the face of the complaint, and it is that they were starved of capital, and the way in which they were starved of capital was that they didn't collect higher prices than they would have liked to have collected from Highmark. Mr. Booker, have I taken the wrong focus in concluding that your argument is that West Penn's reimbursement rates cannot be a source of antitrust injury here because the rates were set before the conspiracy began? Well, that's certainly, that's very important to the statute of limitations argument. But is it important to the antitrust injury? No, when the rates were set or not is not important to the antitrust injury argument. What's important to the antitrust injury argument, and this is what sets this case as alleged in the complaint, accepting it as true, apart from Angelico and Brader and the Paul Meyer case, Judge Sloboda, what sets those cases did not involve a claim for higher prices from a customer, which is what the ground for the damages in this case is. Those cases involved several kinds of effects that are antitrust injury, a vertical agreement that forecloses West Penn from being in the market, for example. For example, an agreement that was an exclusive agreement with UPMC that kept West Penn from access to customers, that would be a vertical foreclosure. Or forcing, which is involved in some of the cases that West Penn relies on. Forcing, for example, an agreement that required customers of Highmark to use only UPMC that forced them or that forced doctors to take patients for certain kinds of services to a particular hospital. That kind of allegation might establish antitrust injury, but neither foreclosure nor forcing nor predatory pricing is alleged. There are cases in which higher prices, a complaint about prices not being high enough might be sustained if the claim was that the low prices being paid by Highmark to West Penn were predatory. In other words, they didn't cover their costs. But that's not what the allegations in this case are. The allegation here is that they were profit, that West Penn was profitable, just not as profitable as they would have been had they gotten higher prices from Highmark. Mr. Booker, you cited our opinion on race tires. Race tires, yes. But that was decided at summary judgment, not on a motion to dismiss. The issue, therefore, of business justification was ripe. How do you, why should we use that case where we knew, there was discovery before us. We knew what was going on. We really, we don't know what's going on. I think there's a good answer to that, Judge Slover. First of all, there are cases which grant motions to dismiss for lack of antitrust injury alleged in the complaint. But in race tires, as to race, there is no case in the Third Circuit in which that's happened. However, what I would suggest to the court is that when a complaint, as this one, makes crystal clear what the foundation for the damages that are sought is, and that that expressly asks that we pay West Penn the same price as we pay the alleged monopolist, UPMC. When that is the case, then under Iqbal, which of course, I always thought this, whatever Twombly means, Iqbal means that Twombly wasn't just about antitrust conspiracy cases. The Twombly standard and the Iqbal standard apply to each element of a cause of action. And when the element of a cause of action is specifically alleged in the complaint to be something that is the little green man of antitrust, the complaint should not be allowed to proceed. In Twombly, the court said we do not apply any heightened pleading standard, nor do we see, let's stop with that. Aren't you asking us to apply a heightened pleading standard here? With respect, Your Honor, no, I'm not. What I'm asking you to do is to accept what has been specifically pled by the plaintiffs and which they are serious about. And by that I mean, there was an original complaint. We filed motions to dismiss. We pointed out that the demand for higher prices was not a demand for antitrust injury. The district court judge authorized an amended complaint. In the amended complaint, they again repeated a description of their damages, which is derived from Highmark not paying higher prices to West Penn. The prayer for relief is much more expansive than you've indicated, though. I'm sorry? The prayer for relief is much more expansive than you've indicated. Well, with respect, Your Honor, I think if you read the complaint cites $100 million in increased profits that they would have had from higher prices. Seeking an injunction. Seeking an injunction to force us to pay higher prices. To end discrimination and reimbursement. And that. Divest its health insurance affiliate. Goes beyond what you've said in my judgment. Well, the divestiture of the health insurance affiliate, I have to confess, I can interpret it as related to the Section 2 monopoly claim, which is only against UPMC. And I'm focusing on the conspiracy claim. Okay, that's fair. Go ahead. I cut off your question. No, I was going to really return to an area that maybe has been adequately covered. But is it reasonable to conclude, as a matter of economic reality, that Highmark would not want UPMC to become too dominant? Because by allowing UPMC to become more dominant, then UPMC gains leverage to negotiate, even force Highmark to pay higher reimbursement rates. I think that. Not only does that make sense, but also that illustrates why a complaint that seeks to require that we pay West Penn the same price that we pay to UPMC is the equivalent of West Penn asking that at our expense, they're sharing this monopoly. That's actually my inquiry. But let me stop you right there. And Ms. Mather can correct me on this if I'm wrong. But I did not understand, do not understand West Penn to be asking that there be an absolute equivalency of rates. Again, she can get to that. But I understood that maybe they deserved higher rates and concomitantly you should have lower rates. But let me return to my inquiry with respect to market dominance and the potential of it. If that's the case, as we both seem to agree it is, how then was it in Highmark's interest to support UPMC's acquisition of Mercy Hospital in 2006 and thereby permit them to become even more dominant? Well, we don't have a record on that. And that doesn't affect the antitrust injury element. However, it, as Your Honor may recall, was widely reported that Mercy Hospital was on the verge of bankruptcy at the time. And the, if this were to proceed, I expect the evidence would show that the choice was either Mercy Hospital shut down and the community lost it or. The allegation is that Highmark publicly supported UPMC's 2006 acquisition of Mercy. Yes, yes. And we accept that as true. Yeah. I understood you to be asking a question beyond that, Your Honor. I apologize if I got it wrong. Okay. Thank you very much. Thank you, Ms. Smith. Judge Smith, you're correct. That is exactly the way we have played the pricing differential issue. Well, that'll be once for the day, if not for the week probably. I very much doubt it. But certainly on that one, I will concede it or agree with it. On the discovery issue, my colleagues tell me I have a better answer than I gave you. So let me get to you now. There was governmental discovery because of the U.S. investigation here. And the easy shot here is, frankly, to release governmental discovery and start there. There was a U.S. Justice Department investigation. Governmental discovery is what occurred during the course of one or both of the investigations that you led. I wanted to ask you about that, but didn't want to belabor your argument previously. I'm still trying to figure out just what is intended for us or for the District Court to make of those allegations concerning a DOJ investigation in the Pennsylvania Insurance Department investigation. They're only investigations. That's right, Your Honor. Even in a pleading, what are we to derive from the mere fact of an investigation? I think it's background, Your Honor, frankly. I don't think it can conclusively. It's a little hyperbole to me. It might be. It seems like a little, just a little, a little something. However, that is defined legally. That could be. But in addition, Your Honor, it does have one piece of factual relevance here. There was a significant change in behavior in 2008. The rates were readjusted to bring them somewhat in line. And we believe and plead that that was a result of the existence of the investigation. To West Penn. To West Penn. Now that significant change of behavior is, this is direct evidence, is it not? Yes, yeah. Let me address very quickly two other things. There was a discussion of how price differential couldn't be the basis of a claim. I think that's inconsistent with the Callahan decision in this district. Linkline is not a conspiracy case. This is a conspiracy case. We argue that there was direct consultation with UPMC as to whether to raise the rates and direction from UPMC as to whether to raise the rates. And where there is that kind of conspiracy. Whether to raise the rates. For West Penn. Okay. Whether to raise. Let me be clear. Whether to raise the high mark rates payable to West Penn. The reimbursement rates. Okay. And Callahan directly says that if the difference in pricing to two entities is a part of a petition, that violates both sections one and two. The only other thing I want to do is go back to Judge Barry's comment about the scope of the relief plan. The plaintiffs here like, or excuse me, the defendants here like to talk about how West Penn wants to raise rates. What West Penn wants to do is get back what it feels is its fair share of the rates in this historic period when it was very much disadvantaged. But that's hardly the scope or the entire scope of the relief. We've asked indeed for lost profits because we believe the under market compensation has impaired our ability, West Penn's ability to provide services and to invest. Lost market share. Lost patience. Lost referrals. Lost growth in the opportunity to invest in broader services. And inflated costs on the debt. This is not a raise our rates and we'll go away kind of case. There's a very broad claim including the injunctive relief for potential damages and if there's anything that Twombly did not give district judges the right or direction to do at the beginning it was to decide those issues. There clearly need to be developed in the case. Could you very briefly comment because nobody has on the allegations that UPMC raided your star physicians? Yes, your honor. Those allegations are relevant to two things and you need to keep this in mind. There are two state law claims, unfair competition and tortious interference. We have no predatory hiring jurisprudence in this circuit. Is that correct? That is correct. And in predatory hiring in the context of an antitrust case is an issue, is issue A. Issue B is those state law claims. Those pleading, those averments are clearly relevant to the state law claims. In addition, your honor, although there is no predatory hiring averment, there is a thread in the case law. There is an averment. No, no, I'm sorry. There is no predatory hiring precedent. I'm sorry in this district. There is a thread in the case law that says when the intent of the effort is to destroy rather than to legitimately hire that there may be a basis for a claim. We've pled it as a predatory act under the monopolization claim and that's why it's there. Anything else? Thank you. Thank you. Thank you. Obviously, this is a case that we will take under advisement. Um, we thank counsel, all three counsel for the arguments that were in the best tradition appellate arguments. Thank you all. Thank you.